IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JUSTIN BARE,

    Plaintiff,

v.                                       CIVIL ACTION NO. 2:16-cv-11049

INNOVATIVE AFTERMARKET SYSTEMS, LP,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Innovative Aftermarket Systems, LP's ("Innovative") Motion to Dismiss. (ECF No. 6.) For reasons discussed below, the Court **GRANTS** the motion.

*I. BACKGROUND*

This action arises out of a complaint brought by Plaintiff in the Circuit Court of Logan County, West Virginia. (ECF No. 1-1 at 1–8.) According to the First Amended Class Action Complaint (the "Complaint"), Plaintiff purchased a vehicle from a Kentucky automobile dealer on April 14, 2012. (*Id.* at 2 ¶ 4.) "As part of the sale, Plaintiff also purchased a 'Protection Plus' policy from [Innovative] for $299.00." (*Id.* ¶ 5.) This "Protection Plus" policy allegedly "guaranteed that the anti-theft system ['the product'] installed on the vehicle would be an effective deterrent to vehicle theft."[1] (*Id.* ¶ 6.) In the event that the product did not deter theft and the

---

[1] As the product is explained in a brochure attached to Innovative's Motion to Dismiss—the authenticity of which Plaintiff does not contest—six "permanent, tamper resistant labels" that are visible only under ultraviolet light and "impossible to remove intact" are attached on different areas of the vehicle. (ECF No. 6-2 at 1.) A "WARNING:

1

vehicle was "not recovered within 30 days or recovered and declared a total loss as the result of the theft," then Innovative would pay Plaintiff a sum of $2,500. (*Id.* ¶ 7.) Plaintiff states that his vehicle was stolen on December 7, 2014, and his automobile insurer allegedly issued him a settlement check on April 24, 2015, for $15,239.61 after declaring the vehicle a total loss. (*Id.* ¶¶ 8–9.) Plaintiff asserts that he made a claim under the "Protection Plus" policy on December 15, 2015, and that Innovative denied the claim as untimely based on the policy's filing requirements. (*Id.* ¶¶ 10–11.)

Based on these alleged facts, Plaintiff contends that Innovative's actions and its product's policy generate the following causes of action: (1) unlawful sale of insurance in violation of West Virginia insurance law and the West Virginia Consumer Credit and Protection Act ("WVCCPA"), (2) common law breach of contract, (3) violations of the West Virginia Unfair Trade Practices Act ("WVUTPA"), and (4) common law bad faith. (*Id.* at 3–6 ¶¶ 17–37.) Plaintiff seeks the following remedies on behalf of a similarly situated class of plaintiffs: actual, compensatory, and punitive damages, a refund of premiums paid, a civil penalty for statutory violations, attorneys' fees and costs, pre- and post-judgment interest, and any other just relief. (*Id.* at 7 ¶¶ 2–9.)

Plaintiff filed the Complaint in the Circuit Court of Logan County, and Innovative removed the case to this Court on November 17, 2016, pursuant to 28 U.S.C. § 1332(a), (d). (ECF No. 1 at 1; *see also id.* at 4–8 ¶¶ 17–28.) Innovative filed its Motion to Dismiss on December 9, 2016. (ECF No. 6.) The motion argues that all of Plaintiff's claims should be dismissed because they all hinge upon the product being insurance, which Innovative contends it is not. (*Id.* at 3.)

---

Traceable Anti-Theft" decal is placed on the car to discourage potential thieves from stealing the vehicle, and any attempt to remove the labels, which "will be obvious," alerts law enforcement that the vehicle is stolen. (*Id.*) Thus, the product aims to both decrease the chances of theft and increase the chances of recovery if theft occurs.

Plaintiff responded to Innovative's motion on December 22, 2016, (ECF No. 8), and Innovative filed its reply on January 6, 2017, (ECF No. 12). The Court stayed discovery in this case for a three-month period beginning on February 6, 2017. (ECF No. 17.) The Motion to Dismiss is fully briefed and ripe for adjudication.

## II. STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

### III. DISCUSSION

Innovative's first argument in its Motion to Dismiss relies on the premise that the theft-prevention product's accompanying policy is not insurance, which would preclude all of Plaintiff's claims. (*See* ECF No. 7 at 8.) Innovative states that the West Virginia Insurance Code, the basis for Count I of the Complaint, does not apply to warranties as they are defined in West Virginia Code § 33-4-2(b)(5). (*Id.* at 4.) Because the product and its accompanying policy fall within a statutory exception to state insurance law, Innovative avers, the company was not required to have any insurance license. (*See id.* at 5–8.) Innovative argues that this finding also prevents Plaintiff's other three claims from being legally cognizable because Count II, "premised upon an administrative code provision found in the Insurance Commissioner regulations title," applies only to insurers; Count III, "premised upon the Unfair Trade Practices article of insurance code," applies only to the sale of insurance; and "Count IV again refers to [Plaintiff] as an insured and refers to West Virginia insurance law." (*Id.* at 8.) Alternatively, Innovative attacks all four counts substantively. (*See id.* at 8–11.)

Plaintiff responds that Innovative did not establish as a matter of law that the product's accompanying policy is not insurance. (*See* ECF No. 8 at 8 (citing W. Va. Code § 33-1-1).) After attempting to distinguish the policy at issue in this case from several in cases cited in Innovative's memorandum of law, Plaintiff concludes that the "aspect of [Innovative]'s motion to dismiss dependent on accepting its characterization of the policy as a warranty should be denied." (*Id.* at 17.) Plaintiff further argues that each of the claims is adequately pled. (*See id.* at 17–24.)

Innovative reiterates in its reply that West Virginia adopted a statute in 2000 defining and exempting warranties from the definition of "insurance." (ECF No. 12 at 4 (citing W. Va. Code

4

§ 33-4-2(a)(4)).) It contends that the *Safe-Guard Products International, LLC* case that Plaintiff relies on is inapposite to the product and policy at issue in this case. (*See id.* at 5–6.) Innovative further argues that the *Riffe* case decided by the West Virginia Supreme Court of Appeals and relied upon by Plaintiff does not affect the application of the "warranty-exemption statute," which was passed after the *Riffe* decision. (*See id.* at 6–7.) Innovative asserts that the federal cases cited by Plaintiff in support of his argument are easily distinguished. (*See id.* at 8–9.)

    *A. The "Protection Plus" Policy is Not Insurance*[2]

The State of West Virginia has codified the definition of "insurance" to mean "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies." W. Va. Code § 33-1-1. "Generally, an insurance policy sets forth an agreement between parties whereby the insured agrees to pay a specified premium, and, in exchange, the insurer agrees to indemnify the insured against the type of losses contemplated within the terms of the policy yet unknowable at its issuance." *McDaniel v. Kleiss*, 503 S.E.2d 840, 846 (W. Va. 1998) (citations omitted). These policies are typically "issued by third parties and are based on a theory of distributing a particular risk among many customers." *Riffe v. Home Finders Assocs., Inc.*, 517 S.E.2d 313, 318 (W. Va. 1999) (quoting *Griffin Sys., Inc. v. Washburn*, 505 N.E.2d 1121, 1124 (Ill. App. Ct. 1987)). *See also* 1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance* § 1.3 (2d ed. 1996) ("In the insurance contract, the risk of an actual loss is distributed (socialized) among a large group of persons exposed to a comparable risk of loss."). For the purposes of determining whether a particular policy is one for insurance, courts must look to the

---

[2] In determining whether the product at issue is insurance, this Court is bound by the substantive law of West Virginia. *See, e.g.*, *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 (4th Cir. 1992) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 73 (1938)).

5

substance of the agreement because "[p]olicy means the contract effecting insurance, or the certificate thereof, *by whatever name called . . . .*" *Riffe*, 517 S.E.2d at 317 (emphasis in original) (quoting W. Va. Code § 33-1-16).

Chapter 33 of the State's code, which is dedicated to insurance law, specifically exempts warranties from the chapter's reach. W. Va. Code § 33-4-2(a)(4). That same section defines "warranty" in the following manner:

> "Warranty" means in relation to a product or service an undertaking that guarantees indemnity for defective parts, mechanical or electrical breakdown, labor costs or other remedial measures, such as repair or replacement of the product or repetition of services and that is made solely by the manufacturer, importer or seller of the product or services made without payment of additional consideration, not negotiated or separated from the sale of the product or service and incidental to the sale of the product or service.

§ 33-4-2(b)(5). Commentators have noted that, generally, "a warranty is not an insurance contract in that the former only promises indemnity against defects in the article sold, while the latter indemnifies against loss or damage resulting from perils outside of and unrelated to defects in the article itself." 1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance* § 1.3 (2d ed. 1996) (citations omitted) (noting that a warranty "may be so drafted, however, as to contain an agreement to indemnify from peril outside of and unrelated to inherent weaknesses in the goods themselves and thus may fall within the purview of an insurance statute").

The West Virginia Supreme Court of Appeals has discussed in a limited number of cases what constitutes insurance within the meaning of W. Va. Code § 33-1-1. In *Riffe*, the court examined a "home warranty contract" that indemnified a new homeowner for repairs to both the home itself and certain personal property items on the property that became necessary after the transfer of ownership. *See* 517 S.E.2d at 315. The company promoting the policy claimed that

6

homes protected by the plan sold faster and for more money. *See id.* The Riffes inherited the policy's benefits from the home's sellers as part of the real estate transaction and sued the company after it denied their claim regarding a problem with the home's foundation. *See id.* at 316. While the company maintained that the contract was a warranty and not insurance, the court held that it was insurance because "a homeowner would file a claim, have the repair made, and would be indemnified by [the company that sold the policy] for the cost of a covered repair, minus any deductible." *Id.* at 317 (citing W. Va. Code § 33-1-1) (noting that there was "no question" that the policy was insurance under state statute). The court went on to explain the following:

> [T]he distinguishing feature which sets [warranties and service contracts] apart from an insurance policy is the fact that the respective companies *manufacture or sell the products which they agreed to repair or replace* . . . Through a warranty or service contract, a company simply guarantees that its own product will perform adequately for a period of time.

*Id.* at 317–18 (emphasis in original).[3]

The reach of "insurance" as defined under West Virginia law was reconsidered in *State ex rel. Safe-Guard Products International, LLC v. Thompson* (*Safe-Guard*), 772 S.E.2d 603 (W. Va. 2015). At issue in *Safe-Guard* was whether GAP Insurance[4] was insurance under § 33-1-1 or a debt cancellation contract outside the scope of the statutory definition of "insurance." *See id.* at 604–05. Following "[d]ispositive guidance" from an Informational Letter issued by the West Virginia Offices of the Insurance Commissioner ("OIC"), the court held that "a debt cancellation

---

[3] This Court recognizes that *Riffe* was decided a year before the West Virginia Legislature enacted a statutory definition of "warranty," exempting policies that fit that definition from the State's insurance laws. However, the West Virginia Supreme Court of Appeals' explanation of the policy at issue in *Riffe* and the distinction between insurance and warranties comports with the statutory definition of "warranty" and suggests that the court would rule similarly had the case been decided after the passage of W. Va. Code § 33-4-2(b)(5). *See Riffe*, 517 S.E.2d at 317–18.

[4] GAP Insurance, as explained by the *Safe-Guard* Court, involved a policy relieving car buyers of "payments owed on [a] vehicle if it was declared a total loss as a result of an accident, and more was owed for the vehicle than the value assigned to it at the time it was totaled." 722 S.E.2d at 604.

7

contract is not considered insurance[] if it is directly provided by a lending institution to the purchaser of a product." *Id.* at 606. However, Safe-Guard was not the lender in that scenario. Rather, Safe-Guard issued a policy to the plaintiff that would indemnify her lender "in the event Ms. Hinkle's vehicle was a total loss and she still had a balance owed to the lender." *See id.* at 608. Because the policy "require[d] a third party to indemnify a lender," the court found that the GAP Insurance was insurance under § 33-1-1. *See id.* at 606, 608–09.

The West Virginia Supreme Court of Appeals has not applied the statutory definitions of "insurance" or "warranty" to automobile theft prevention products and their policies. Nevertheless, at least four federal district courts have examined whether this type of product's policy constitutes "insurance" under the laws of the states in which those courts are located. For example, *Pope v. TT of Lake Norman, LLC* involved an amended complaint whose claims hinged on the court's determination of whether the etching product at issue was insurance.[5] *See* 505 F. Supp. 2d 309, 310–11 (W.D.N.C. 2007). The product purported to "deter theft of vehicles by making resale of stolen vehicles containing the Etching product more difficult and risky for car thieves." *Id.* at 310. Upon a one-time payment of $349 by the car buyer, the product's seller guaranteed that it would pay "$5000 to any customer whose car [was] stolen and not recovered within 30 days." *Id.* at 310–11. North Carolina previously enacted a statutory definition of "warranty" that exempted policies falling under its ambit from the state's insurance laws. *See id.* at 311. The court concluded that the etching product met the statutory requirements of a "warranty" because "it [was] clear that Etch's limited warranty protect[ed] customers in the event the product fail[ed] as a theft deterrent." *Id.* at 312. It dismissed the plaintiffs' claims "based

---

[5] The etching product in *Pope* consisted of "a small number applied to the windshield or other windows of a vehicle with a kit consisting of a piece of scored paper and a dab of chemical." 505 F. Supp. 2d 309, 310 (W.D.N.C. 2007).

upon their allegations that Etch is insurance." *Id.* (relying on an advisory letter issued by the North Carolina Attorney General indicating that a comparable product was a warranty and not insurance).

Similarly, the guarantee accompanying Alexico Corporation's ("Alexico") product known as Premium Care Theft-Gard ("PCTG") was deemed warranty and not insurance by two district courts in *Moroz* and *Falkenberg*. *See Falkenberg v. Alexico Corp.*, No. 07-4149 (RBK), 2008 WL 2478384, at *3 (D.N.J. June 17, 2008); *Moroz v. Alexico Corp.*, No. 07–3188, 2008 WL 109675, at *4 (E.D. Pa. Jan. 7, 2008). PCTG, which was distributed, sold, and administered by Alexico, consisted of a unique number etched into a car's front windows and registered into company records. *See* 2008 WL 109675, at *1, 4 (finding that the purpose of PCTG was to deter car theft and aid in the recovery of stolen vehicles). Alexico guaranteed that if a vehicle was stolen within three years of PCTG's installation and not recovered within thirty days or recovered but considered a total loss, it would pay to PCTG's owner $3,000 or the vehicle's wholesale value if less. *See id.* at *1. The court in *Moroz* held that PCTG was not insurance under common law. *Id.* at *4 (noting that "insurance" was not defined under Pennsylvania statutory law). While PCTG required that the purchaser carry comprehensive theft insurance, the *Moroz* Court found that Alexico sought "to guarantee the performance of the product, not to insure against car theft" and dismissed five counts in the complaint that were premised on the contention that PCTG was insurance. *Id.* ("[T]he 'overall objective' of the arrangement is simply to warrant [PCTG]'s performance."). The *Falkenberg* Court reached the same conclusion under common law that PCTG is not insurance and dismissed three counts in the complaint that were premised on the status of PCTG as insurance. *See* 2008 WL 2478384, at *2–3 (noting that while New Jersey does

9

not have a statutory definition of "insurance," the court's conclusion was "supported by holdings from other branches of the New Jersey government"). The court reasoned as follows:

> Though Plaintiff characterizes this payment as indemnification, the Court agrees with Defendants, who characterize the payment as a warranty of [PCTG]. The warranty, which accompanies the window etch product and cannot be purchased separately, merely provides some monetary benefit in the event that [PCTG] does not work and the vehicle is stolen and not recovered . . . The fact that there may be some shifting of the risk of loss from the customer to the manufacturer is not enough to transform the essential nature of the product. Because Defendants' guarantee is based on [PCTG]'s performance and not merely the happening of a future occurrence, it constitutes a warranty and not insurance.

*Id.* at *3.

At least one district court has ruled that, under the laws of New York, facts supporting an allegation that an anti-theft window etching product was insurance were adequately pleaded to survive a motion to dismiss. *See Seekamp v. Fuccillo Auto. Grp., Inc.*, No. 1:09–CV–0018 (LEK/DRH), 2010 WL 980581, at *7 (N.D.N.Y. Mar. 15, 2010). Under that product's policy, the issuing company would indemnify the car dealership "if the dealer had to issue a credit towards a new vehicle purchase due to theft." *See id.* at *1 (explaining that the dealer would provide the product owner "with a 10% discount towards the purchase of a replacement vehicle, in an amount up to $2000"). An "insurance contract" was statutorily defined in New York, and the court noted that "the New York Insurance Department has interpreted a 'fortuitous event' [under the definition of 'insurance contract'] to be the theft or non-recovery of a vehicle, which is the triggering event under the 'etch' theft-deterrent agreement." *Id.* at *5–6 & n.5 (citations omitted) (recognizing that "warranty" was not defined under New York insurance law). The court cited a New York Insurance Department opinion, which was directly relevant to the policy at issue, finding that "by offering a discount on a vehicle purchase following an unrecovered theft or total loss, the consumer

10

would ultimately be provided with a 'benefit of pecuniary value upon the happening of a fortuitous event.'" *Id.* at *6 (citation omitted). Partly because the policy's issuing company would indemnify the dealership and not the product owner, the court found that the policy may be considered insurance and the plaintiff's complaint could survive the motion to dismiss. *See id.* at *7.

Here, the statutory definition of "warranty" in West Virginia is similar to that in North Carolina, which was analyzed by the *Pope* Court.[6] *See Pope*, 505 F. Supp. 2d at 311–12. Both definitions require an indemnity guarantee from the product's manufacturer or seller for defective parts also made by the product's manufacturer or seller without additional payment. *See supra* note 6. The West Virginia definition contains an additional requirement that a warranty is not negotiated or separated from the product's sale; it must be incidental to the sale of the product. *See* W. Va. Code § 33-4-2(b)(5). Plaintiff claims that he paid $299 for the policy, and "[i]n the Protection Plus policy, [Innovative] guaranteed that the anti-theft system installed on the vehicle would be an effective deterrent to vehicle theft." (ECF No. 1-1 at 2 ¶¶ 5-7.) While Plaintiff's

---

[6] *Compare* W. Va. Code § 33-4-2(b)(5) ("'Warranty' means in relation to a product or service an undertaking that guarantees indemnity for defective parts, mechanical or electrical breakdown, labor costs or other remedial measures, such as repair or replacement of the product or repetition of services and that is made solely by the manufacturer, importer or seller of the product or services made without payment of additional consideration, not negotiated or separated from the sale of the product or service and incidental to the sale of the product or service."), *with* N.C. Gen. Stat. § 58-1-15(b), cited in *Pope*, 505 F. Supp. 2d at 311 ("Any warranty made solely by a manufacturer, distributor, or seller of goods or services without charge . . . that guarantees indemnity from defective parts, mechanical or electrical breakdown, labor, or any other remedial measure, including replacement of goods or repetition of services, shall not be a contract of insurance . . . .").

The Court notes that, while not considered by the court in *Pope*, North Carolina also has a statutory definition for "ancillary anti-theft protection program warranty" that specifically exempts these types of products from state insurance laws. *See* N.C. Gen. Stat. § 66-370(b)(1a) ("A written agreement by a warrantor that provides if the ancillary anti-theft protection program fails to prevent loss or damage to a motor vehicle from a theft, that the warrantor will pay to or on behalf of the warranty holder specified incidental costs, as a result of the failure of the ancillary anti-theft protection program to perform pursuant to the terms of the ancillary anti-theft protection program warranty."); *see also* § 66-370(b)(1) (defining an "ancillary anti-theft protection program" to include "window etch products" that are installed on automobiles and "designed to prevent loss or damage to a motor vehicle from theft").

Complaint does not describe the product, it states that the product includes a policy intended to guarantee the product's performance. (*See id.* ¶¶ 5–6.) He further alleges that the policy "guaranteed Plaintiff a payment of $2,500.00 *if the anti-theft system failed* and the vehicle was stolen and not recovered within 30 days or recovered and declared a total loss as the result of the theft." (*Id.* ¶ 7 (emphasis added).) Thus, the Complaint alleges that Innovative sold him the policy that included without additional payment a guarantee to indemnify him if Innovative's product failed. (*See id.* ¶¶ 4–7.) Plaintiff does not allege that the product and policy were sold separately. (*See id.* ¶¶ 4–5.)

Moreover, the purpose of the product here is similar to that of the products in *Pope*, *Moroz*, and *Falkenberg*—to deter vehicle theft and aid in the vehicle's recovery if stolen. *See* 2008 WL 2478384, at *3; 2008 WL 109675, at *4; 505 F. Supp. 2d at 312. This is evidenced by the Protection Plus Warranty Registration form, which is attached to the Motion to Dismiss, relied on by Plaintiff in the Complaint, and not contested by Plaintiff in terms of authenticity.[7] (*See* ECF No. 6-1 at 1 ("The Vehicle Security Anti-Theft System installed on the vehicle guarantees to the Registered Owner/Lessee of the described vehicle that the System installed will be an effective deterrent against vehicle theft. In the event the System fails and the described vehicle is stolen and not recovered within thirty (30) days or is RECOVERED and declared a Total Loss as a result

---

[7] "[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). Consideration of these documents at the 12(b)(6) stage is appropriate and comports with the following policy rationale allowing for consideration of these types of documents in a 12(b)(6) analysis: "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Plaintiff here relies on the "Protection Plus" policy form throughout the Complaint, and the policy is central to all of the Complaint's claims. (*See* ECF No. 1-1 at 2 ¶¶ 5–7, 11; 3–6 ¶¶ 17–37.) Thus, the Court will consider that document, (ECF No. 6-1), in ruling on the Motion to Dismiss.

of the theft, $2,500 Benefit will be paid directly to the Registered Owner/Lessee."); *see also* ECF No. 8 at 12–13.) As the *Pope* Court concluded, "it is clear" that the policy here "protects customers in the event the product fails as a theft deterrent." *See* 505 F. Supp. 2d at 312.

Plaintiff relies on *Seekamp* to discredit the decisions in *Moroz* and *Falkenberg*, (*see* ECF No. 8 at 15–17), but the dispute in *Seekamp* involved a policy issuer indemnifying a car dealership after the dealer issued a credit to the policyholder purchasing a replacement vehicle. *See* 2010 WL 980581, at *1. In effect, the policy issuer indemnified a third party rather than the policyholder herself in the event that the vehicle was stolen. Further, the New York Insurance Department had previously issued an opinion specifically including anti-theft window etching products within the ambit of the state's insurance laws. *See id.* at *6. The West Virginia OIC has not issued similar guidance,[8] nor does the product's policy at issue here purport to indemnify anyone other than the person who purchases the policy. (*See* ECF No. 6-1 at 1.)

The policies examined under West Virginia law in *Safe-Guard* and *Riffe* are distinguishable from the policy in this case. Plaintiff attempts to equate the policy here to the GAP Insurance in *Safe-Guard* and the home warranty contract in *Riffe*. (*See* ECF No. 8 at 8–12.) However, neither of those cases involved a company seeking to guarantee indemnity for the failure of a product that

---

[8] Plaintiff states in his response to the Motion to Dismiss that "it should be remembered that the OIC determined that contracts analogous to the one at issue here are considered in West Virginia to be an insurance transaction." (ECF No. 8 at 14.) The only prior reference in Plaintiff's response to a state agency opinion on insurance contracts was in his discussion of *Safe-Guard*. (*See id.* at 9–10.) In *Safe-Guard*, the West Virginia Supreme Court of Appeals analyzed Information Letter No. 171 issued by the OIC. *See* 772 S.E.2d at 606. That letter set out the U.S. Department of the Treasury's definition of a debt cancellation contract and concluded that "[a] contract in which a third party is obligated to indemnify the lender—as a result of a specified event that causes the lender to not be repaid by the borrower—is not a debt cancellation contract or debt suspension agreement. This type of contract is an insurance transaction and is subject to the insurance laws of the State of West Virginia." *Id.* The court relied on that Information Letter to hold that "a debt cancellation contract is not considered insurance, if it is directly provided by a lending institution to the purchaser of a product." *Id.* This appears inapposite to the facts here as Plaintiff has not alleged that the product involves a debt cancellation contract of any kind. Further, the parties have not alluded to any other Information Letter issued by the OIC that may be relevant to the current issue.

the company itself manufactured or sold. The defendant company in *Safe-Guard* did not manufacture or sell the vehicle that, when totaled in a crash, triggered the indemnity, *see* 772 S.E.2d at 604–05, and the defendant company in *Riffe* did not manufacture or sell the home or the personal property that, when in need of repair, triggered the indemnity, *see* 517 S.E.2d at 315–16. The situation here is like in *Moroz* and *Falkenberg*, where the courts found that Alexico's product was not insurance because the policy simply warranted the product's performance, the policy could not be purchased separately from the product, and the monetary benefit upon the product's failure was paid directly to the product purchaser. *See* 2008 WL 2478384, at *3; 2008 WL 109675, at *4. Similarly, the policy here, which Plaintiff does not claim was purchased separately from the product, guarantees the product's performance, and the monetary benefit would be paid to Plaintiff who purchased the policy. (*See* ECF No. 1-1 at 2 ¶¶ 5–7; ECF No. 6-1 at 1.)

Plaintiff alleges in the Complaint that he purchased the policy from Innovative and that Innovative guaranteed to pay him if its product failed to deter vehicle theft. (*See* ECF No. 1-1 at 2 ¶¶ 5–7.) It is this alleged relationship between Plaintiff and Innovative and the circumstances under which the product was purchased that lead this Court to conclude that, assuming all the factual allegations in the Complaint are true, the product's policy fits squarely within West Virginia's statutory definition of "warranty." *See* W. Va. Code § 33-4-2(b)(5). Because the policy at issue here is a warranty, it is exempt from the State's insurance laws. *See* § 33-4-5(a)(4).

*B. Count I*

Count I of the Complaint alleges unlawful sale of insurance in violation of W. Va. Code § 33-3-1. (ECF No. 1-1 at 4 ¶ 18.) The Court determined that Chapter 33 of the West Virginia Code does not govern the policy here because it is not insurance, so this claim must fail. Count I

also claims that Innovative violated provisions of the WVCCPA "[b]y collecting premiums that it was not entitled to recover and selling an insurance product while not licensed to sell such product . . . ." (*Id.* ¶ 19 (alleging violations of W. Va. Code §§ 46A-2-127, 46A-6-102, 46A-6-104, 46A-6-106).)

Innovative argues that regardless of whether the policy is insurance, the WVCCPA claims in Count I still fail to survive Rule 12(b)(6) because Count I relies on Innovative being a debt collector, which it says it is not. (*See* ECF No. 7 at 8.) Plaintiff contends that Count I should partially survive despite a ruling that the policy is not insurance because Innovative is a "debt collector," bringing regulation of its policy under the WVCCPA. (*See* ECF No. 8 at 19.) Innovative's reply submits that Count I should be dismissed regardless of the Court's decision as to whether the product's policy here is insurance because Innovative is not a debt collector as provided by the statutory definition and because the WVCCPA does not apply to the alleged improper sale of insurance. (*See* ECF No. 12 at 10–12.)

The WVCCPA provides that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims . . . ." W. Va. Code § 46A-2-127. Where the defendant is not a debt collector or creditor of the plaintiff within the definition of the WVCCPA,[9] the state statute does not apply. *See Grubb v. Jos. A. Bank Clothiers, Inc.*, No. 2:05-0056, 2005 WL 1378721, at *7 (S.D. W.Va. June 2, 2005) ("There being no credible allegation that defendant became plaintiff's creditor in the transaction, plaintiff has no

---

[9] The WVCCPA defines "debt collector" as "any person or organization engaging directly or indirectly in debt collection." W. Va. Code § 46A-2-122(d). "Creditor" is defined by the WVCCPA as "an institution, the deposits of which are insured by the Federal Deposit Insurance Agency, the National Credit Union Share Insurance Fund, or a subsidiary of such an institution, or a subsidiary of a holding company owning such an institution . . . ." *Id.* § 46A-3-109a(a)(5).

colorable right to the imposition of a civil penalty under [the WVCCPA]."). Further, "the sale of insurance is not covered by the general consumer protections in [WVCCPA] Article 6," violations of which Plaintiff alleges here. *See Hinkle v. Matthews*, No. 2:15-13856, 2016 WL 3945734, at *2–4 (S.D. W.Va. July 19, 2016) (analyzing the same GAP Insurance at issue in *Safe-Guard* and granting the defendant's motion to dismiss with regard to the plaintiff's WVCCPA claim). In *Hinkle*, this Court determined that a deferral of payment is necessary to find a "claim" under the WVCCPA:

> While the West Virginia Supreme Court of Appeals has not addressed whether insurance contracts with a single upfront premium payment involve the collection of a "claim" under the WVCCPA, it has acknowledged that the definition of "claim" in the statute is "essentially identical" to the definition of "debt" in the analogous federal Fair Debt Collection Practices Act ["FDCPA"] . . . There can be no "debt" under the FDCPA without a deferral of payment. The court sees no reason that a "claim" under the WVCCPA should not also require a deferral of payment. Consequently, Safe-Guard has not been shown to have engaged in debt collection.

*Id.* at *3 (citations omitted).

Plaintiff alleges that he made an upfront, one-time payment of $299 for the policy, and he does not claim that there was any deferral of payment or additional payment required. (ECF No. 1-1 at 2 ¶ 5.) Without a deferral of payment, Plaintiff cannot allege a collectable "claim" as defined under the WVCCPA. *See Hinkle*, 2016 WL 3945734, at *3 (citing W. Va. Code § 46A-2-122(b)). In addition to finding that the policy is not insurance, the Court also finds that Innovative is not a debt collector or creditor under the WVCCPA. Thus, Plaintiff's claims under West Virginia insurance law and the WVCCPA must fail, and the Court **DISMISSES** Count I.

C. Count II

Plaintiff concedes that "there is no independent ground for addressing" Count II if the Court accepts Innovative's argument that the policy at issue is not insurance. (ECF No. 8 at 17.) While the Court does not agree that the breach of contract claim found in Count II relies on the policy's status at insurance, Plaintiff has failed nonetheless to state a claim upon which relief can be granted as he does not assert that a valid, enforceable contract has been breached. (*See* ECF No. 1-1 at 4 ¶¶ 21–24.) *See also Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015) (citations omitted) ("A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages."). Rather, Plaintiff claims that the contract is void because it does not conform to West Virginia regulatory requirements, (*see id.* ¶ 22), which is an improper basis for a breach of contract claim. *See Gen. Elec. Capital Corp. v. Bishop*, No. 1:11–cv–00315, 2012 WL 6202758, at *4 (S.D. W.Va. Dec. 12, 2012) (citations omitted) ("In order to establish a claim for breach of contract under West Virginia law, a plaintiff must prove . . . the existence of a valid, enforceable contract . . . ."). Accordingly, the Court now **DISMISSES** Count II.

  D. *Count III*

Count III of the Complaint alleges that Innovative "violated its statutory duties set forth in the [WVUTPA] in W. Va. Code § 33-11-4, *et seq.*[,] as well as all regulations promulgated thereunder . . . ." (*Id.* at 5 ¶ 33.) The WVUTPA falls within Chapter 33 of the West Virginia Code, and as the Court outlined earlier, that chapter specifically exempts warranties from the statute's reach. *See* W. Va. Code § 33-4-2(a)(4). The Court determined that the product's policy here is a warranty under West Virginia law, which precludes the State's insurance statutes, including the WVUTPA, from governing it. *See Hawkins v. Ford Motor Co.*, 566 S.E.2d 624,

629 (W. Va. 2002) (holding that the WVUTPA applies "only to those persons or entities and their agents who are engaged in the business of insurance"). Plaintiff's claim relying on the WVUTPA must fail, and the Court **DISMISSES** Count III.

### E. Count IV

Plaintiff concedes that "there is no independent ground for addressing" Count IV if the Court accepts Innovative's argument that the policy at issue is not insurance. (ECF No. 8 at 17.) The Court agrees that a common law bad faith claim is not available to Plaintiff if Innovative did not provide insurance. *See Hawkins*, 566 S.E.2d at 629 (holding that the tort of bad faith only applies to those who are engaged in the business of insurance). The Court found that the policy is not insurance, and as such, the Court now **DISMISSES** Count IV.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Innovative's Motion to Dismiss, (ECF No. 6). Further, the Court **DISMISSES** this case, and **DIRECTS** the Clerk to remove this action from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: May 5, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE